In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2471

MICHAEL DAVIS,

*Plaintiff-Appellant*,

*v.*

DONALD MORONEY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:13-cv-01462-SLD — **Sara Darrow**, *Judge*.

ARGUED APRIL 25, 2017 — DECIDED MAY 22, 2017

Before POSNER, KANNE, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. Michael Davis, an inmate at Illinois Pontiac Correctional Center, sued a guard, Donald Moroney, for allegedly using excessive force against him, but the district court dismissed the suit for failure to prosecute. Davis now challenges the denial of a subsequent motion for relief from judgment under Federal Rule of Civil Procedure 60(b). He argues that exceptional circumstances warrant relief from the judgment, principally because mental impairments

prevented him from prosecuting the case without the aid of counsel.

Davis filed this suit under 42 U.S.C. § 1983 in 2013 against guard Moroney along with the prison's warden and other prison officials responsible for the prison's grievance process. In his complaint Davis alleged that while speaking with another inmate he accidentally bumped into Moroney, apologized, but Moroney responded by hitting Davis in the jaw, throat, and chest, twisting his arm behind his back, slamming his head against a wall, and handcuffing him. Davis charges that the other defendants, in an effort to cover up Moroney's assault, conspired to deny him access to the prison's grievance procedure by failing to process and return his grievances.

Davis asked the district court to recruit counsel for him, stating that he "had to obtain complete assistance" in order to be able to prosecute his suit. He had tried to secure counsel on his own, he added, and referred to a letter from a law firm corroborating his attempt to obtain representation; but no letter was attached to his motion.

The district court screened Davis's complaint, see 28 U.S.C. § 1915A, and allowed him to proceed on his excessive-force claim against Moroney. But the court dismissed the conspiracy claim against the other defendants on the ground that Davis had no federal constitutional right to a grievance procedure and therefore could not "present a meritorious claim." The court also denied Davis's motion for counsel, on the ground that he'd failed to demonstrate that he'd made a reasonable attempt to obtain counsel.

Discovery ensued, but Davis failed to respond to interrogatories propounded by Moroney concerning Davis's attempts to exhaust his administrative remedies.

Two months later Davis repeated his request for recruitment of counsel, stating that he had a mental illness and was unable to aid the inmate who was preparing his court filings. Davis attached to his motion an affidavit from the assisting inmate, Claude McGee, who asserted that "it is almost common knowledge that Mr. Davis has a mental illness" and that Davis's "judgment is substantially impaired, along with his perceptions of reality, all of which rendered it essentially impractical to effectively communicate with Mr. Davis to meet deadlines, [or to] fully and fairly participate in the discovery process." Two months later the district court denied Davis's request for counsel on the ground that he'd failed to demonstrate that he had tried to secure counsel on his own and because his claim was "not unduly complex and relies largely on information of his personal knowledge."

The court allowed Davis 21 more days to respond to Moroney's interrogatories. On the twenty-first day Davis renewed his motion for recruitment of counsel, asserting that the case was difficult for him because he reads at a 6th-grade reading level, lacks communication skills, and has a "paranoid delusional disorder." He also attached his "legal mail card," which cataloged his incoming and outgoing mail to a number of law firms. And he asked the court to order the prison to turn over his medical records. Moroney, having still received no response to his interrogatories, filed another motion to compel Davis to respond.

The district judge took no further action for nine months, then issued a scheduling order stating that "there are no

pending issues requiring discussion." The order directed Moroney to provide Davis with, among other things, Davis's "relevant medical records" and "relevant grievances and all responses to those grievances."

Without it appears responding to the court's directive, a month later Moroney filed a motion to dismiss Davis's suit under Fed. R. Civ. P. 41(b) for lack of prosecution because Davis still had not answered the interrogatories. The district judge responded with two orders: the first denied Davis's renewed motion for recruitment of counsel because his "claim is not unduly complex and relies largely on information within his personal knowledge," and instructed Davis to request his medical records through his institution—whatever that means. The judge's second order warned Davis that his case would be dismissed unless he filed answers to Moroney's interrogatories within 14 days. Twenty days later Davis filed a motion to reconsider the denial of his motion for recruitment of counsel but did not respond to the interrogatories. The district court then granted Moroney's motion to dismiss Davis's suit, explaining that Davis had failed to comply with the judge's orders directing him to respond to the interrogatories. The judge denied Davis's motion to reconsider the denial of his motion for recruitment of counsel as moot.

Almost a month later Davis filed a "Motion to Reconsider/Reinstate Cause" and argued that the court had disregarded his "possible mental impairments" that prevented him from effectively litigating his case. He also asked the court to give him more time to find an attorney. The court did not find Davis's arguments "persuasive" and so denied the motion. Nine days later Davis filed a Rule 59(e) motion

to alter or amend the judgment, stating that he was "extremely slow mentally," that he lacked the ability "to produce any form of effort to pursue this cause," and that the circumstances were exceptional because he had "insufficient knowledge of any complexity of the case" and could not represent himself. The motion also alleged that prison staff had retaliated against the inmates who had prepared Davis's filings for him. The court denied this motion the next day as untimely, pointing out that Davis had missed the 28-day deadline for making a "genuine" motion under Fed. R. Civ. P. 59(e).

Five months later Davis filed still another motion for recruitment of counsel (his fourth) based on his mental deficiencies. He stated that his I.Q. was under 73 and that he could not understand Moroney's filings. The court denied this motion, presumably because the case had been dismissed, but noted that it was not clear whether Davis intended to request counsel to assist him with an appeal.

Two months later Davis moved for relief from judgment under Fed. R. Civ. P. 60(b)(1) and (b)(6), again mentioning his mental shortcomings. He stated that he has an I.Q. of only 66 and the "mind of a child," is barely literate, and could not meet the court's deadlines without aid or supervision. In light of these difficulties (as well as his inability to understand Moroney's interrogatories), he added, the court should have recruited counsel for him.

In May 2016 the district court denied his motion for relief from the judgment, noting that Davis had not responded to Moroney's interrogatories despite two orders directing him to do so, and adding that Moroney's defense had been prejudiced by Davis's failure to respond.

The only issue in this appeal, as agreed by the parties, concerns the denial of Davis's Rule 60(b) motion. Assisted by counsel that this court recruited, Davis argues that the district judge decided that motion incorrectly because she didn't account for his exceptional circumstances—namely his mental impairments. He also contends that like the plaintiff in *Donald v. Cook County Sheriff's Department*, 95 F.3d 548 (7th Cir. 1996), his difficulty in litigating this case has stemmed from the district court's handling of it—notably the judge's nine-month delay in responding both to Moroney's second motion to compel a response to his interrogatories and to Davis's renewed motion for recruitment of counsel.

The controlling issue is whether Davis has established a basis for relief under Fed. R. Civ. P. 60(b), which so far as relates to this case allows a court to relieve a party from a final judgment on grounds of "excusable neglect" (Rule 60(b)(1)), or "any other reason that justifies relief" (Rule 60(b)(6)). While relief under that rule has been described as "an extraordinary remedy … granted only in exceptional circumstances," *Bakery Machinery & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009), the circumstances of this case *are* extraordinary—notably Davis's intellectual limitations.

Davis also argues that the district court did not properly consider his impairments and lack of resources in its denials of his motions for counsel, and also that the court erred by not considering his motion to reconsider the entry of judgment as a motion under Rule 59(e). He contends that the district court did not evaluate that motion under the proper standard and that as a result he (Davis) may not have understood that he should have filed an appeal. But as Moroney

points out, this court lacks jurisdiction to consider the district court's denial of this motion because Davis did not file a *timely* notice of appeal.

Although Moroney and the district judge made points that would be compelling in another setting, involving a different type of grievant, they are outweighed by the equities in favor of Davis that stem from his severe intellectual limitations, coupled with his lack of legal assistance; and while review of a district court's denial of a Rule 60(b) motion is deferential, if the judge is "very far off base … or omitted to consider some important relevant factor," the denial cannot stand. *Tolliver v. Northrop Co.*, 786 F.2d 316, 319 (7th Cir. 1986). Davis's intellectual limitations, asserted in his and McGee's affidavits, are not contradicted by Moroney, who did not dispute the assertions in the affidavits submitted by Davis and McGee. Nor had the district judge been given any reason to doubt that Davis was intellectually disabled.

Furthermore the judge attached far too much weight to Davis's failure to respond to Moroney's interrogatories—for they were little better than a ploy aimed at a person incapable of responding intelligently. The information sought included "the number of grievances you wrote related to the issues in your complaint, … the date on which you wrote each grievance[;] the date(s) of submission of each grievance to your counselor; the date(s) of submission of each grievance to the Grievance Officer; the date(s) of submission of each grievance to the Administrative Review Board; whether you submitted the grievance(s) to anyone else; the manner in which you submitted the grievance(s) at each level; the name of any person to whom you gave the grievance(s) at each level of the process; the date(s) of response(s) at any

level; the date(s) of final determination(s) by the Administrative Review Board; and whether you are in possession of any grievance(s) or grievance response(s) related to this lawsuit. If you are not, state why you are not." Not only did most of these questions exceed Davis's capacity to answer them, but almost all the information requested from Davis resided in the files of the prison and were thus immediately accessible by Moroney. While Davis was unlikely to have retained the dates demanded by Moroney, copies of the grievances he had submitted, or the names of most of the persons to whom he had submitted his grievances, or to understand "each level of the process," Moroney, as a member of the prison's staff and in cahoots with the other defendants, had access to *everything* Davis had filed with the prison administration and so had no need to seek information from Davis. The Prison Litigation Reform Act provides that "no action shall be brought [under federal law] with respect to prison conditions … by a prisoner … until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Moroney was therefore entitled to argue as a defense that Davis had failed to exhaust his administrative remedies—had failed to timely submit a grievance to the prison's Administrative Review Board. But in the particular circumstances of this case the insistence on a response amounted to cruel harassment of a mental defective.

To cast some additional light on whether Davis, given his mental handicaps, could have been expected to understand most of the orders he received from the district judge and Moroney, we conducted an experiment using the Flesch Reading Ease Readability Formula. Downloadable free of charge from the Internet (see, e.g., Readability Formulas, "The Flesch Reading Ease Readability Formula," www.read

abilityformulas.com/flesch-reading-ease-readability-formula
.php, visited May 22, 2017), Flesch is a test used to estimate
the difficulty for given readers of understanding a given
text. The formula is simple: it measures the ratio of syllables
to words, and words to sentences, in the text; the higher
those ratios, the more difficult the text is to understand. Of
course other qualities of a text contribute to how difficult it
is to understand, but the Flesch formula is a helpful heuristic that correlates well with difficulty—for example, the average ratios of random samples of the *Harvard Law Review*
are higher than the average ratios of random samples of
*Time* magazine; the *Harvard Law Review* is more difficult to
read than *Time*. See Rudolf Flesch, *How to Write Plain English*
26 (1979). Having determined how difficult the text is, the
Flesch test translates that score into a prediction of what educational level a reader would have to have attained in order to be able to understand the text.

Applied to Moroney's interrogatories, the Flesch test reveals that their comprehension requires a reading ability
consistent with having completed 8th, maybe 9th, grade in
school. The most optimistic assessment of Davis's reading
ability is that he can read at a 6th-grade level—two or three
levels below the reading ability required for an understanding of the interrogatories.

Davis needs help—needs it bad—needs a lawyer desperately. He did not have a fair opportunity to prosecute his
case. As in *Donald v. Cook County Sheriff's Dept.*, 95 F.3d 548,
554 (1996), "the plaintiff's difficulties are traceable in considerable part to the way the matter was handled by the district court." The district judge, although purporting to apply
the standard for deciding whether to recruit pro bono coun-

sel set forth in *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007) (en banc), overlooked our emphasis in that case on the need to consider whether the *particular* plaintiff is competent to litigate his own claims, as by being able to "prepar[e] and respond[] to motions and other court filings" himself. *Id.* at 655. In combination, Davis's severe intellectual handicaps, his apparently diligent efforts to pursue his case despite those handicaps, his potentially meritorious claim, and the irregularities of the district court's handling of the case, amount to "extraordinary circumstances" justifying relief under Rule 60(b)(6) of the Federal Rules of Civil Procedure from the final judgment in this case. See *Ramirez v. United States*, 799 F.3d 845, 851 (7th Cir. 2015); *Donald v. Cook County Sheriff's Dept.*, *supra*, 95 F.3d at 554. The denial of Davis's motion for relief from final judgment is therefore reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

KANNE, *Circuit Judge*, concurring. I join in the majority's reversal of the district court's decision denying Davis's motion for relief from final judgment and the majority's remand for further proceedings. I write separately to briefly discuss certain factors.

When reviewing a district court's denial of an indigent prisoner plaintiff's motion to recruit counsel for him, we make three inquiries: "(1) has the indigent plaintiff made reasonable efforts to retain counsel or been effectively precluded from making such efforts before requesting appointment; (2) given the difficulty of the case, did the plaintiff appear to be competent to try it himself; and (3) if not, would the presence of counsel have made a difference in the outcome." *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc) (internal citations and quotations marks omitted).

Here, the district court erred at the mandatory first step by not crediting Davis for following existing precedent in attempting to obtain a lawyer to represent him. *See Jackson v. Cty. of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992). In fact, the defendant does not contest that Davis had contacted several lawyers seeking representation in this litigation.

Moreover, the long extended give-and-take between the district judge and the parties failed to get to the heart of the matter: whether the district court should have tried to appoint counsel for Davis. The court could have addressed this issue by appointing a magistrate judge to conduct a hearing at the prison. The magistrate judge could have considered both Davis's efforts to obtain counsel and the difficulty Davis experienced in dealing with the case. In addition, but less satisfactorily, the district judge could have held a hearing by telephone to achieve the same end.

With counsel, Davis likely would not have missed the deadlines for written discovery. Thus, the outcome of the case in the district court would have been different.

I agree that, in this case, the district court should have tried to obtain counsel for Davis because of the totality of extraordinary circumstances. However, the use of Davis's unverified (albeit undisputed) IQ score as a metric to determine his reading ability—and therefore, the need for legal representation—is problematic. Davis first claimed that his IQ score was under 73, and later that his IQ was only 66. Initially, as noted, the validity of Davis's IQ is not supported by any proper validation. Furthermore, his claimed 6th-grade reading level and lack of communication skills were only unverified allegations.

In the general scheme of recruiting pro bono counsel, it is extremely significant that the number of inmates in prison with low IQs is substantial. *See generally* Brie Diamond, Robert G. Morris & J.C. Barnes, *Individual and Group IQ Predict Inmate Violence*, 40:2 Intelligence 115 (2012) ("[T]he literature suggests that IQ—at the individual and macro-level—is negatively correlated with crime … .").

If, therefore, an IQ score is routinely used to establish reading ability and thus a need for counsel, it should be based on valid testing. Indeed, the use of an IQ level will certainly result in a much larger number of prisoner cases being added to the dockets of district courts. Such an outcome would be contrary to the intent of Congress exhibited by enacting the Prison Litigation Reform Act, 42 U.S.C. § 1997e. *See Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (noting that Congress enacted the Prison Litigation Reform Act to

reduce the quantity of the ever-increasing number of pris-oner lawsuits).

Nevertheless, given the totality of applicable extraordinary circumstances, and specifically, because the district court did not credit Davis's attempts to obtain legal representation, I agree that the final judgment must be reversed and the case remanded.