In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 18-1522 & 18-2880

LAJIM, LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

GENERAL ELECTRIC COMPANY,

*Defendant-Appellee*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Western Division.
No. 13-cv-50348 — **Iain D. Johnston**, *Magistrate Judge*.

———————————

ARGUED JANUARY 15, 2019 — DECIDED MARCH 4, 2019

———————————

Before FLAUM, KANNE, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs-appellants purchased land near a former General Electric Company manufacturing plant that had operated for sixty years; the plant leached toxic chemicals that seeped into the groundwater. The Illinois Environmental Protection Agency filed suit under state law against General Electric in 2004 and has been working with the company since then to investigate and develop a plan to address the contamination. In 2013, plaintiffs filed suit under

the citizen suit provision of the Resource Conservation and Recovery Act, seeking a mandatory injunction ordering General Electric to conduct additional investigation into the scope of the contamination and ordering the company to remove the contamination. The district court found the company liable for the contamination on summary judgment but denied plaintiffs' request for injunctive relief because, despite the many opportunities the court provided, plaintiffs did not offer evidence establishing a need for injunctive relief beyond what the company had already done in the state action. For the following reasons, we affirm.

## I. Background

### A. Statutory Scheme

The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). The RCRA "is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Id.* Rather, the primary purpose of the RCRA "is to reduce the generation of hazardous waste and to ensure the proper treatment … of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Id.* (quoting 42 U.S.C. § 6902(b)).

The RCRA contains a citizen suit provision, which provides that "any person may commence a civil action" against "any person" who has allegedly violated "any permit, standard, regulation, condition, requirement, prohibition, or order

which has become effective pursuant to this chapter," or "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1). Once the violation or potential endangerment is shown, a district court "shall have jurisdiction … to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" and "to order such person to take such other action as may be necessary." *Id.* § 6972(a).

## B. Factual Background

### 1. *General Electric Plant in Morrison, Illinois*

Defendant-appellee General Electric Company ("GE") operated a manufacturing plant in Morrison, Illinois from 1949 to 2010. To remove oil from the automotive and appliance parts it manufactured, the plant used chlorinated organic solvents, including trichloroethylene ("TCE"), perchloroethene ("PCE"), and trichloroethane ("TCA"). These solvents are toxic and are regulated by federal and state environmental agencies. GE used these solvents and stored them in degreasers located at the plant until 1994, when it switched to a soap-like solution to clean the parts.

In 1986, chlorinated solvents were detected in three municipal supply wells that provided water to the City of Morrison, located several thousand feet southeast of the GE plant. Shortly thereafter, the Illinois Environmental Protection Agency ("IEPA") installed monitoring wells to analyze the

groundwater around the GE plant, which uncovered additional contamination. The IEPA completed a Phase I Remedial Investigation in 1987, which included sampling and analysis of soil, water, and sediment. Based on the investigation, the IEPA identified the GE plant as the source of the solvent contamination.

In 1988, GE installed additional monitoring wells and an air stripper to treat water pumped from one of Morrison's municipal wells to a level of contamination below the maximum contaminant level ("MCL") so the city could continue to use the well as a source of drinking water; the other two municipal supply wells were sealed. GE also conducted a Phase II Remedial Investigation, which identified elevated concentrations of solvents beneath the plant's former degreasing operations. Under the IEPA's supervision, GE continued to sample and monitor the groundwater in the monitoring wells and submitted reports of the results to the IEPA.

In 1994, the IEPA required GE to conduct a Phase III Remedial Investigation of the groundwater at and downgradient from the plant. GE reported the results of the investigation in 2001. According to the report, the solvents in the groundwater had decreased significantly by 2001, and the report modeled that the contaminants would naturally attenuate (*i.e.*, reduce) to concentrations below the MCL. Additionally, the report stated that Rock Creek was a natural groundwater divide that would prevent the contaminating solvents from migrating south from the GE plant across the creek. The report concluded that the contamination did not pose a risk to the public because a City of Morrison ordinance prohibited

the use of groundwater as a source of drinking water and because GE's air stripper at the remaining municipal supply well provided safe drinking water.

In response, however, the IEPA did not approve GE's proposal for natural attenuation of the contamination; instead, the IEPA concluded that active remediation of the site would be appropriate. The Illinois Attorney General commenced suit against GE in 2004 under the Illinois Environmental Protection Act: for cost recovery (Count I), *see* 415 Ill. Comp. Stat. 5/22.2(f); to enjoin water pollution (Count II), *see* 415 Ill. Comp. Stat. 5/42(d)–(e); and to enjoin a water pollution hazard (Count III), *see* 415 Ill. Comp. Stat. 5/12(d). The state sought to recover costs it had incurred as well as an injunction requiring that GE investigate the nature and extent of the contamination and then perform remediation. In 2010, GE and Illinois entered into a Consent Order in which GE agreed to submit to the IEPA a series of reports, including: (1) "a work plan to survey private wells, install additional monitoring wells, and complete additional soil borings"; (2) "a Focused Site Investigation Report ('FSI') summarizing the results of the work plan"; (3) "a Remedial Objectives Report to address the impact of the soil and groundwater contamination"; and (4) "a Remedial Action Plan to meet the remediation objectives within six years of the entry of the Consent Order." Also in 2010, the City of Morrison passed an ordinance prohibiting groundwater as a source of potable water and prohibiting the installation of wells "to limit threats to human health from groundwater contamination."

After approval of a work plan, GE installed monitoring wells along Rock Creek. Then, in 2013, GE submitted its FSI detailing the data obtained from the various monitoring

wells; the report explained that the solvents had migrated south of the plant and that the monitoring wells along Rock Creek tested positive for contamination at levels above the MCL. Tests from wells on the other side of Rock Creek (and further from the plant) either did not detect chlorinated solvents or detected TCE at a level below the MCL. Following discussions between GE and the IEPA on the work plan and FSI, the IEPA conditionally approved the FSI in March 2015. It determined that GE "adequately defined the nature and extent of the contamination." The IEPA conditionally approved GE's revised Remedial Objectives Report in August 2016, after a number of additional submissions and a meeting between the technical representatives from GE and the IEPA.

In March 2017, GE submitted its Remedial Action Plan ("RAP") to the IEPA, proposing to achieve the remediation objectives through a "combination of institutional controls and monitored natural attenuation." The IEPA denied GE's proposal in June 2017, posing several questions about the plan, and specifically noting that it did not accept "an open-ended period of monitored natural attenuation as a remediation technology." GE submitted a revised RAP to the IEPA in October 2017, responding to the IEPA's questions and comments and proposing to address the remaining contamination through institutional controls. The IEPA approved GE's revised Remedial Action Plan in March 2018.

### 2.  *Plaintiffs' Interest in the Land*

Plaintiff-appellant Lowell Beggs[1] purchased land near the site of the shuttered GE plant in 2007. He conveyed the property to plaintiff-appellant Prairie Ridge Golf Course, LLC, which plaintiff-appellant LAJIM, LLC operated. Beggs moved into a home next to the golf course with his companion, plaintiff-appellant Martha Kai Conway (the "Conway home"). The golf course and Conway home are located south of the former GE plant and downgradient from the plant.

When Beggs considered purchasing the golf course in April 2007, the seller advised him: "the golf course has contamination on the first hole. This was caused by General Electric. If you go to the EPA web site, GE is listed as a superfund site. No further remediation was needed according to what I can find." Beggs did not inquire further about the environmental condition of the golf course before completing the purchase in May 2007. The purchase agreement noted, "[S]eller [] has disclosed to Purchaser that there is contamination on the first hole of the Real Estate, such contamination having been caused by General Electric, as which contamination is part of the Superfund Site that apparently does not require any further remediation." Additionally, Beggs walked the golf course prior to completing the purchase and noticed a monitoring well head protruding above the ground. After purchasing the property, Beggs contacted GE to fix a leak from the fixture, which he knew monitored "how much stuff was coming out of GE."

---

[1] Beggs passed away during the course of this litigation. His interest is now represented by the executor of his estate, plaintiff-appellant First National Bank of Amboy.

### C. Procedural Background

Plaintiffs filed suit in the Northern District of Illinois on November 1, 2013 seeking: (1) a mandatory injunction requiring GE to remediate the contamination under the RCRA, *see* 42 U.S.C. § 6972(a)(1)(B) (Count I); (2) cost recovery (Count II) and a declaratory judgment (Count III) under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), *see* 42 U.S.C. §§ 9607(a), 9613(g)(3); and (3) recovery under state law for nuisance (Count IV), trespass (Count V), and negligence (Count VI).

After what the district court characterized as "extensive discovery," the court considered the parties' cross-motions for partial summary judgment. Plaintiffs moved for summary judgment on their RCRA claim. GE did not dispute that plaintiffs satisfied the first two elements of the claim—(1) defendant has generated solid or hazardous waste, and (2) defendant has contributed to the handling of the waste. *See Albany Bank & Tr. Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 972 (7th Cir. 2002). On the sole remaining question—whether plaintiffs established that the contamination "may present an imminent and substantial danger to health or the environment," *id.*—the district court found for plaintiffs and granted summary judgment as to GE's liability under the RCRA. At plaintiffs' request, the court deferred consideration as to whether plaintiffs were entitled to injunctive relief. On GE's cross-motion for summary judgment on the state law claims, the district court found the continuing tort doctrine did not apply and found the claims time-barred because plaintiffs had knowledge of the claims more than five years before they filed suit.

Over the next two years, the district court considered plaintiffs' request for a mandatory injunction in a number of hearings and a series of opinions. On October 4, 2016, the court held that the plain language of the RCRA permitted, but did not require, the court to grant injunctive relief despite the ongoing state proceeding; thus, the question before the court was not whether it *could* grant relief but whether it *should*. On this point, the court concluded plaintiffs had not yet provided the court with facts supporting their assertion that the Consent Order in the state action was deficient and ineffective. The court ordered an evidentiary hearing and invited the IEPA and the Illinois Attorney General to provide their views on the progress under the Consent Order and whether the court should order injunctive relief under the RCRA. The Illinois Attorney General's Office submitted an amicus brief explaining that the State did not believe the court should impose injunctive relief because any court-ordered injunctive relief would overlap with the work currently being done—*i.e.*, "site investigation, monitoring and payment of costs as well as an order barring further endangerment … [and] some type of remedial effort." The State asserted that all such actions were already underway and were "being done with diligence and rigorous oversight by the Illinois EPA," and that injunctive relief "may result in a clean-up that is inconsistent with clean ups of other contaminated sites in Illinois."

After two days of evidentiary hearing on June 1 and 2, 2017, the court issued an opinion on September 7, 2017 denying the requested injunctive relief. Both parties had presented expert testimony at the hearing; the district court credited GE's expert as having "provided reasonable, rational and credible bases explaining why certain actions were taken and others were not," whereas it found plaintiffs' expert did not

provide conclusions but merely "testified that additional investigation and testing was necessary to opine on the proper scope of remediation for the site." Notably, when asked by the district court judge what specific cleanup he recommended, plaintiffs' expert declined to make a recommendation. The district court thus concluded that plaintiffs had not met their burden of showing harm not already addressed sufficiently by the IEPA proceeding. The court denied plaintiffs' motion to reconsider the denial of injunctive relief on November 7, 2017. Plaintiffs voluntarily dismissed the remaining count under the CERCLA with prejudice and filed a notice of appeal on March 6, 2018.

Then, on March 23, 2018, plaintiffs filed a motion for an indicative ruling under Rule 62.1 and motion to reconsider based on newly discovered evidence. Plaintiffs pointed to the IEPA's March 2, 2018 approval of GE's Remedial Action Plan, which relies solely on institutional controls to address the remaining contamination. The district court denied plaintiffs' motion on August 14, 2018, and plaintiffs appealed. That appeal was consolidated with plaintiffs' original appeal; both are jointly before us now.

## II. Discussion

### A. Injunctive Relief

Plaintiffs raise several issues related to the district court's denial of injunctive relief: they assert (1) the district court did not have discretion to deny injunctive relief once it found GE liable under the RCRA; (2) the district court erred in conducting the traditional balancing of equitable factors for injunctive relief; and (3) the district court erred in finding plaintiffs failed

to establish irreparable harm. Plaintiffs' arguments on each issue fail to carry the day. We note that the denial of injunctive relief after a district court has found a risk of imminent and substantial danger to public health or to the environment should be rare. Here, however, plaintiffs failed to provide the district court with any evidence that injunctive relief, in addition to what the IEPA had already ordered in the state action, would improve the environment and not cause additional harm.

### 1. *Discretion to Deny Relief*

On summary judgment, the district court found GE liable for contaminating groundwater in a manner that "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). This finding has not been challenged on appeal. After finding GE liable, the district court then considered whether plaintiffs were entitled to injunctive relief as a remedy for the violation. Plaintiffs assert, however, that once the district court made a finding of liability, the RCRA required the court to order injunctive relief.

In analyzing whether the RCRA mandates the imposition of injunctive relief upon a finding of liability, we first look to the plain language of the statute. *See United States v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016). The RCRA provides, in relevant part:

[A]ny person may commence a civil action on his own behalf— …

> (1)(B) against any person, … including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; ….

> *The district court shall have jurisdiction … to restrain any person* who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), [or] *to order such person to take such other action as may be necessary* ….

42 U.S.C. § 6972(a) (emphasis added). As plaintiffs acknowledge, this language *authorizes* injunctive relief—it provides the district court with jurisdiction to restrain a violator or to order other necessary action. But nothing in the language *mandates* injunctive relief; "shall" pertains only to the grant of jurisdiction and not to the relief the district court may order.

Nor do our past comments on the RCRA indicate injunctive relief is mandatory upon a finding of liability. In *Adkins v. VIM Recycling, Inc.*, we considered whether the prohibitions in the RCRA or several abstention doctrines precluded the

plaintiffs from bringing a citizen suit under the RCRA after the state had already filed enforcement actions against the same alleged violators. 644 F.3d 483, 487 (7th Cir. 2011). We concluded that neither the statutory language nor the abstention doctrines prevented the *Adkins* plaintiffs from pursuing their citizen suit. *Id.* Critically, we made clear that "[w]e [did] not suggest, of course, that once a citizen suit has cleared RCRA's statutory hurdles it is immune from all other constitutional and preclusive doctrines, such as standing, mootness, and claim or issue preclusion." *Id.* at 503. In so stating, we advised courts to consider these doctrines before awarding relief, thus evidencing that plaintiffs are not presumptively entitled to injunctive relief once they have "cleared RCRA's statutory hurdles."

Furthermore, the Supreme Court applies traditional equitable principles to environmental statutes. For example, in a Federal Water Pollution Control Act case, the Supreme Court explained that the statute did not require courts to immediately enjoin all statutory violations; instead, the Court highlighted that long-established principles of equity applied:

> It goes without saying that an injunction is an equitable remedy. It is not a remedy which issues as of course or to restrain an act the injurious consequences of which are merely trifling. An injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable.

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982) (citations and internal quotation marks omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) ("An injunction

is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.") (reversing and vacating grant of injunction under National Environmental Policy Act); *Town of Huntington v. Marsh*, 884 F.2d 648, 651 (2d Cir. 1989) ("In applying these general equitable standards for the issuance of injunctions in the area of environmental statutes, the Supreme Court has explicitly rejected the notion that an injunction follows as a matter of course upon a finding of statutory violation."). The same principles apply to the RCRA; the remedy of an injunction does not issue as a matter of course upon a finding of liability but only as necessary to protect against otherwise irremediable harm.

Thus, the district court correctly held that it has discretion to award injunctive relief under the RCRA and is not required to order relief after a finding of liability.

### 2. *Traditional Balancing of Equitable Factors*

In a similar but distinct argument, plaintiffs assert that the district court erred in applying the traditional equitable factors when considering whether to award injunctive relief. To merit injunctive relief, a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Plaintiffs base their argument on their role in this citizen suit as private attorneys general, acting on behalf of the public. They argue that it is common in environmental protection cases for courts to order injunctive relief without the traditional balancing of equitable factors where the only statutory relief available is injunctive relief and where the plaintiff is a sovereign or private attorney general. However, commenting directly on the RCRA, we have reasoned that "[o]rdinarily, a court is obligated to conduct an equitable balancing of harms before awarding injunctive relief, even under an environmental statute which specifically authorizes such relief (as does RCRA section 3008(a))." *United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867 (7th Cir. 1994).

True, once a court finds a defendant liable for creating a risk of imminent and substantial danger, it will usually be the case that injunctive relief is warranted. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.… [T]herefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."). But that is not always the case. Courts must consider the traditional equitable factors, which appears to be what the district court did here. *eBay*, 547 U.S. at 391. One aspect of the district court's reasoning does, however, give us pause. Despite the previous finding that GE created a risk of imminent and substantial harm, the district court stated at the relief stage that irreparable harm is an "essential requirement" for injunctive relief and defined irreparable harm as "both certain and great, not merely serious or substantial." To

the extent that language might be interpreted as requiring RCRA plaintiffs to demonstrate harm above and beyond that shown at the merits stage, the district court erred.

Multiple circuits have held that RCRA plaintiffs need only show "a risk of harm," not "the traditional requirement of threatened irreparable harm," to justify an injunction. *United States v. Price*, 688 F.2d 201, 211 (3d Cir. 1982); *see also Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 777 (10th Cir. 2009) ("Our prior case law indicates that under RCRA a plaintiff need not 'show proof of actual harm to health or the environment' to establish endangerment, but rather injunctive relief is appropriate where there simply *may* be a risk of harm."); *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991) (quoting *Price* for the same proposition); *United States v. Waste Indus., Inc.*, 734 F.2d 159, 165 (4th Cir. 1984) (same).

The standard adopted by our sister circuits makes sense, especially in the permanent injunction context. RCRA authorizes only injunctive relief. *Meghrig*, 516 U.S. at 484. Accordingly, absent a permanent injunction, a prevailing RCRA plaintiff will receive no remedy. The proven harm is, by definition, irreparable absent an injunction. *See generally Walgreen Co. v. Sara Creek Prop. Co., B.V.*, 966 F.2d 273, 275 (7th Cir. 1992). A RCRA plaintiff either demonstrates irreparable harm or fails to prove his or her case on the merits.

We reiterate, however, that a permanent injunction does not automatically follow from success on the merits. *See Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 296–97 (1st Cir. 2006) ("[I]n an environmental case, [the court] should consider the balance of relevant harms before granting injunctive relief, even though the statute itself

authorizes such relief. … [I]t is true that a district court is not commanded, regardless of the circumstances, to issue an injunction after a finding of liability" under the RCRA.); *United States v. Marine Shale Processors*, 81 F.3d 1329, 1360 (5th Cir. 1996) ("We find nothing in RCRA which, 'in so many words, or by necessary and inescapable inference, restricts the court's jurisdiction in equity.'" (quoting *Weinberger*, 456 U.S. at 313)). District courts should apply the traditional equitable factors to determine the necessity of injunctive relief.[2]

### 3. *Necessity of Injunctive Relief*

Plaintiffs next claim the district court erred in denying injunctive relief because it found they failed to establish irreparable harm. We review a district court's denial of injunctive relief for an abuse of discretion; we review its factual determinations for clear error and its legal conclusions de novo, and

---

[2] The unique procedural history of this case may also be a source of plaintiffs' confusion regarding the applicable standard. Here, the court made a liability finding—that the contamination "may present an imminent and substantial endangerment to health or the environment," 42 U.S.C. § 6972(a)—nearly two years before it denied the injunction. In finding GE liable under the RCRA, the district court agreed that there may be a risk of endangerment from the contamination. But in denying the injunction, the district court found that plaintiffs failed to demonstrate harm not already addressed in the state action. We do not see a conflict between the district court's holdings on liability (which acknowledges the risk of harm) and the injunction (which it denied for lack of evidence of unaddressed harm).

we give deference to the court's balancing of the equitable factors. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018).

As an initial matter, we must address GE's contention that plaintiffs abandoned their request for remediation at the evidentiary hearing, instead deferring to a request for additional investigation prior to remediation. According to GE, plaintiffs have thus waived their claim to an injunction ordering remediation. We disagree. GE mischaracterizes plaintiffs' position; although plaintiffs' expert at the evidentiary hearing testified he believed additional investigation was necessary to determine the extent of the contamination and the correspondingly appropriate remedy, at no point did plaintiffs retreat from their request for remediation. They reiterated that request in their complaint, in their initial motion for an injunction, in argument at the evidentiary hearing, and in their motions for reconsideration. Plaintiffs have not waived their request for an injunction requiring GE to remediate the contamination.

Turning to plaintiffs' argument regarding the irreparable harm finding, we note that it is somewhat indirect. Rather than directly challenging the district court's factual findings, plaintiffs repeat their general assertion: There is contamination, therefore there is harm. And because there is harm, there must be an injunction. In oversimplifying the argument, plaintiffs fail to grapple with the thoughtful and nuanced decisions the district court made that led it to deny injunctive relief. In their request for an injunction, plaintiffs claimed action under the RCRA was necessary because the Consent Order and actions in the state proceeding were insufficient to remedy their injury. For that reason, the district court informed the parties *repeatedly* that it was looking for evidence

of harm not already being addressed through the state proceeding and for what exactly plaintiffs wanted the court to order GE to do to address that harm.

At the evidentiary hearing, plaintiffs argued that the extent of the contamination had not been determined and that the IEPA's analysis based on a limited investigation was flawed; as such, their expert testified that additional investigation was necessary before he could opine on the proper remediation. Plaintiffs requested GE perform the following additional investigation: additional and deeper monitoring wells, soil borings penetrating the bedrock, and vapor-intrusion monitoring to the extent necessary to (1) determine if a dense non-aqueous phase liquid ("DNAPL") is present and, relatedly, determine the vertical and horizontal extent of the groundwater contamination; (2) determine whether Rock Creek is a groundwater divide, and if so, explain the presence of contamination in the well across the creek; and (3) determine the source of and monitor the vapors present in the Conway home. Noting that many of these issues are interrelated, the district court considered the competing expert testimony presented on each avenue of investigation.

Although plaintiffs do not directly challenge the district court's factual findings, we review those findings briefly to highlight the court's thoroughness in evaluating the evidence (or lack thereof) supporting plaintiffs' request for injunctive relief. A district court's finding of an expert witness's credibility is one of fact that we review for clear error. *Madden v. U.S. Dep't of Veterans Affairs*, 873 F.3d 971, 973 (7th Cir. 2017). Clear error is a deferential standard of review that only merits reversal if "after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been

made." *United States v. Ranjel*, 872 F.3d 815, 818 (7th Cir. 2017) (quoting *United States v. Marty*, 450 F.3d 687, 689–90 (7th Cir. 2006)). "[I]n a case of dueling experts, as this one was, it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony." *Madden*, 873 F.3d at 973–74 (alteration in original) (quoting *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008)).

i.    DNAPL and Groundwater Contamination

Plaintiffs argued that GE's testing was insufficient to determine whether a DNAPL is present. However, plaintiffs did not take any of their own samples or conduct any of their own tests, despite their expert—Dr. Banaszak—testifying that groundwater sampling is not prohibitively expensive. Instead, Dr. Banaszak advocated that GE drill deeper soil borings that penetrate the bedrock and that GE install additional monitoring wells north of the existing wells to determine if the groundwater traveled north and carried contamination north of the plant. Based on his review of GE's testing, Dr. Banaszak concluded that the results did not show that the contamination plume "is stable or shrinking, which leaves the possibility that a DNAPL exists."

GE's expert, Dr. Vagt, who has been the project director of the site since 2008, testified that additional investigation is unnecessary because the evidence demonstrates no DNAPL is present. He explained that the concentration of TCE in the samples has decreased over time, whereas, if a DNAPL were present, the TCE concentrations would have remained constant. As to the need for a north monitoring well, Dr. Vagt testified that soil samples taken north of the plant (near the site of an alleged potential additional source of TCE) detected little to no TCE. Dr. Vagt concluded (and the IEPA agreed), that

no additional testing was necessary. And Dr. Vagt conducted site visits, which led him to conclude that the groundwater flowed south, not north, as Dr. Banaszak had hypothesized based on a conceptual site model. Additionally, Dr. Vogt advocated against drilling through the bedrock; he opined that the only conduit for contamination through the bedrock was the preexisting city well, and that any additional drilling could be harmful in that it could provide a new route for contamination to travel through the bedrock.

The district court concluded that GE's investigation into the presence of DNAPL, and the IEPA's approval of the investigation, was not unreasonable. Because plaintiffs "merely offer[ed] different conclusions about the data collected by [GE] and the data they hope[d] to develop with additional investigation and testing," the district court found that plaintiffs had not met their burden to show that any additional testing for DNAPL was necessary. The district court weighed the competing expert testimony and found GE's expert made reasonable conclusions supported by facts; we see nothing in the court's factual findings that are clearly erroneous.

### ii.   Rock Creek

As to Rock Creek's status as a groundwater divide, plaintiffs and GE again offered differing interpretations of the same data. Plaintiffs argued that the lone sample from the south well containing trace amounts of TCE evidences that contamination is flowing past Rock Creek. They further contended that the rest of the wells on the south of Rock Creek, which did not detect contamination, are not deep enough to properly measure contamination. GE, on the other hand, maintained that Rock Creek is a groundwater divide. The IEPA required that GE install additional monitoring wells and

test the residential wells south of Rock Creek to confirm this proposition. Dr. Vagt contrasted the contaminated samples from the north side of Rock Creek with the lack of contamination from the south side wells; he testified that the single sample from the south well with trace levels of contamination was an outlier when compared with the lack of contamination in the six other monitoring wells and residential wells located in close proximity and at varying depths.

Weighing the competing expert testimony, the district court found that plaintiffs had not offered any additional testing that would "seriously challenge the finding that Rock Creek is a groundwater divide." Again, we cannot conclude this conclusion is clearly erroneous.

### iii.    Vapor Intrusion

Lastly, the district court considered plaintiffs' request for vapor intrusion monitoring for the Conway home and the surrounding residences. By the time of the evidentiary hearing, plaintiffs had sold the Conway home. They agreed the court did not have the power to force access into the home for testing but asked the court to order GE to obtain consent from the new owners. They based this request on a 2012 test that detected the compound 1,2 DCA in the indoor air in the Conway home at a level above the residential standard. After detecting this compound, however, GE took samples of the groundwater and sub-slab under and around the Conway home, which did not reflect contamination. GE thus maintained that there is no complete pathway between the source of the GE-site contamination and the indoor air in the Conway home, and that 1,2 DCA comes from a variety of sources unrelated to the site contamination (such as household cleaners). The IEPA

agreed that, without a complete pathway, no additional testing was necessary.

The district court stated that it was "not in a position to second guess the IEPA's decision based on Plaintiffs' discontent with the decision." Considering that plaintiffs no longer own the Conway home and the court does not have authority to force the new owners to consent to testing, as well as the lack of a complete pathway from the site contamination to the home, we cannot say that the district court clearly erred.

*        *        *

While an injunction does not follow automatically from a finding of a risk of imminent and substantial endangerment—as this case demonstrates—such a finding usually goes a long way towards justifying an injunction. Here however, despite the district court's admonition that it was looking for evidence of harm requiring relief in addition to the IEPA action, at no point did plaintiffs ever conduct their own investigation to contradict GE's test results. Rather, they continue to insist that irreparable harm is "self-evident" where there is contamination and criticize GE's investigation, which had been conducted subject to the IEPA's oversight and direction. As demonstrated by the two years it spent grappling with the injunctive relief questions, the district court understood it had to "walk a fine line" between supplementing and supplanting the Consent Order. The court focused on the facts before it, commenting repeatedly that "facts matter," and it provided plaintiffs with numerous opportunities to present evidence that the state proceedings were not adequately protecting the public and the environment. *See Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 140 (3d Cir. 2013) (explaining that ongoing remediation in independent proceedings may

justify the denial of injunctive relief in the RCRA action); *Adkins*, 644 F.3d 501–02 ("When this case finally addresses the merits, and if the [state environmental] actions have been resolved by then, the federal court will be entitled to insist that plaintiffs show how the resolution of those cases was not sufficient."). In the end, plaintiffs could not present contradictory facts because they did not conduct any of their own investigation. As the district court held, plaintiffs "have not provided the evidence necessary for this Court to second guess [GE]'s Remedial Action Plan" and order relief in addition to what the IEPA has already required.

Nevertheless, plaintiffs insist they are entitled to relief because they did not get what they wanted; they want more than the IEPA found adequate and will be satisfied with nothing less than a mandatory injunction ordering GE to remove any contamination on their property. We sympathize with plaintiffs' position—TCE is a dangerous contaminant and the current plan leaves the contamination in place (though contained and restricted from access). But, despite plaintiffs' characterization, the RCRA is not a "cleanup" statute. *See Meghrig*, 516 U.S. at 483 ("[The] RCRA is not principally designed to effectuate the cleanup of toxic waste sites …."). Under the RCRA, the district court may "restrain" the handling of hazardous waste that "may present an imminent and substantial endangerment to health or the environment," or order actions that may be "necessary" to eliminate that danger. 42 U.S.C. § 6972(a).

Here, the district court considered both parties' expert presentations and concluded that plaintiffs had not established any additional actions were "necessary" to eliminate the danger. In spite of the district court's multiple inquiries to

plaintiffs' expert as to what remedy he proposed the court order, he did not make a recommendation, leaving the court without guidance. Conversely, the court found GE's explanations for the actions it had taken to investigate and develop its remediation plans "reasonable, rational and credible." The RCRA does not require a court-ordered cleanup where the court has not found such action necessary to prevent harm to the public or the environment, especially where, as here, an expert the court found credible testified that additional cleanup could cause further harm.

The district court did not abuse its discretion in concluding plaintiffs had not carried their burden to establish mandatory injunctive relief was necessary under the RCRA.

### B. Motion for Indicative Ruling and for Reconsideration

Next, plaintiffs contend the district court erred in denying their motion for indicative ruling under Rule 62.1 and for reconsideration under Rule 60(b)(2). Relief under Rule 60(b) is "an extraordinary remedy … granted only in exceptional circumstances." *Davis v. Moroney*, 857 F.3d 748, 751 (7th Cir. 2017) (alteration in original) (quoting *Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009)). We review the district court's decision for abuse of discretion. *Gleason v. Jansen*, 888 F.3d 847, 851–52 (7th Cir. 2018).

A refresher of the timeline of events is necessary: Prior to the district court's ruling on the motion for injunction, the IEPA had denied GE's initial Remedial Action Plan, which proposed natural attenuation and institutional controls to address the contamination. After the district court denied the in-

junction in September 2017, plaintiffs dismissed their remaining claim with prejudice and filed a notice of appeal. In October 2017, GE submitted a revised RAP to the IEPA, in which GE proposed institutional controls as the sole method of remedial action. Then, on March 2, 2018, the IEPA approved GE's revised RAP. Shortly thereafter, plaintiffs filed a motion for indicative ruling under Rule 62.1(a)(3), which provides:

> If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: … state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Civ. P. 62.1(a)(3). In the motion, plaintiffs raised a single basis for their requested relief: the IEPA's approval of GE's revised RAP. Plaintiffs asserted that the IEPA's March 2, 2018 approval was newly discovered evidence supporting reconsideration of the denial of the injunction.[3]

Plaintiffs' arguments fail for two reasons. First, the IEPA's March 2, 2018 approval of GE's RAP is not "newly discovered evidence" under Rule 60(b)(2). *See* Fed. R. Civ. P. 60(b)(2) ("On motion and just terms, the court may relieve a party or its legal representative from a final judgment … for … newly discovered evidence that, with reasonable diligence, could

---

[3] Although plaintiffs did not file a separate motion for relief from judgment and failed to explain that they were seeking relief under Rule 60(b)(2) until their reply brief, the district court excused this omission and treated the Rule 62.1 motion as a joint motion for reconsideration under Rule 60(b)(2).

not have been discovered in time to move for a new trial under Rule 59(b).”). Newly discovered evidence must have been in existence at the time of the original judgment or pertain to facts in existence at the time of the judgment. *Peacock v. Bd. of Sch. Comm'rs of City of Indianapolis*, 721 F.2d 210, 214 (7th Cir. 1983) (per curiam). The district court did not abuse its discretion in finding that neither the revised RAP submitted in October 2017 nor the IEPA's March 2, 2018 approval existed at the time of its September 2017 judgment. Rather, they were *new* evidence that did not exist and thus could not have been discovered at the time. Nor did the district court err in concluding that the revised RAP did not pertain to facts in existence at the time of judgment. To the contrary, the revised RAP responded to the IEPA's questions and concerns, contained new information for the IEPA to consider, and included a new proposed remedy.

Second, even if it were “newly discovered” evidence, the district court did not abuse its discretion in holding that the IEPA's approval of the revised RAP would not have changed the outcome. According to plaintiffs, the district court's denial of injunctive relief was predicated on the IEPA's rejection of GE's initial RAP. For that reason, they claim that the IEPA's acceptance of the revised RAP that did not require any additional remedies is a basis upon which the district court should have reconsidered injunctive relief. In support, plaintiffs pointed to the district court's statement that “[t]he IEPA's actions, including the latest [RAP] rejection, is strong evidence that Plaintiffs' injuries are being remedied in the parallel state-court proceeding.” In denying the Rule 62.1 motion, however, the district court explained that plaintiffs misunderstood its ruling: “The [c]ourt merely used the IEPA's most recent rejec-

tion to highlight that the IEPA had been making well-reasoned decisions under the Consent Order and had challenged numerous actions [GE] had taken ….” Noting that plaintiffs were using the approval of the revised RAP to make the same arguments the court had rejected throughout the case, the district court concluded that plaintiffs had not offered any newly discovered evidence that would necessitate injunctive relief.

The district court did not abuse its discretion in denying the motions for indicative relief and for reconsideration.

### C.  State Law Tort Claims

Lastly, plaintiffs assert that the district court erred in granting summary judgment to GE on their state law claims of nuisance, trespass, and negligence. We review a grant of summary judgment de novo, viewing the record in a light most favorable to the nonmoving party. *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1053 (7th Cir. 2018).

In Illinois, the statute of limitations for tort claims for damage to property is five years. 735 Ill. Comp. Stat. 5/13-205. It is undisputed that, here, Lowell Beggs knew about the contamination of the golf course from the GE plant at the time he purchased the property in 2007, but he did not file suit until November 2013, more than five years later. Plaintiffs argue, however, that GE is committing a continuous violation because it “is doing nothing to stop its contamination from migrating,” and that, under the continuing tort doctrine, the five-year statute of limitations does not bar their claims.

“[W]hen ‘a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease.’” *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (quoting *Belleville Toyota*

*v. Toyota Motor Sales, U.S.A.*, 770 N.E.2d 177, 190 (Ill. 2002)). The problem with plaintiffs' argument is that the "continuing" action they allege is not that GE is continuing to release contaminants, but that the original contamination is continuing to migrate. However, "[a] continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003); *see Village of DePue v. Viacom Int'l, Inc.*, 713 F. Supp. 2d 774, 779 (C.D. Ill. 2010) (continuing tort doctrine did not apply where plaintiff's allegations were limited to injury from water flowing from contaminated site because tortious conduct had ceased when manufacturing at site ended years prior); *Soo Line R.R. Co. v. Tang Indus., Inc.*, 998 F.Supp. 889, 896–97 (N.D. Ill. 1998) (continuing tort doctrine did not apply where defendant stopped dumping contaminants years prior, "although the effects from [defendant]'s violations may be persisting"). The continuing migration plaintiffs allege is merely an ill effect from the original violation, not a continuing unlawful act.

Nor does plaintiffs' assertion that GE retains possession of the plant and has mismanaged the remediation suffice as a continuing injury. As the district court explained, application of the continuing tort doctrine "turns on continuing conduct, not continuing ownership or continuing injury." *Compare Village of DePue*, 713 F. Supp. 2d at 779 ("merely owning the Site" after contamination insufficient for liability under continuing tort doctrine), *with City of Evanston v. Texaco, Inc.*, 19 F. Supp. 3d 817, 827–28 (N.D. Ill. 2014) (continuing tort doctrine applied "at least at the pleadings stage" where defendant's underground tanks allegedly continued leaking contaminants into the environment even though defendant no longer owned the property). That GE retains possession of the plant

is of no import where there is a lack of demonstrated continuing unlawful conduct.

Because plaintiffs do not allege a continuing unlawful act necessary to invoke the continuing tort doctrine, we affirm the grant of summary judgment to GE on plaintiffs' state law tort claims.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.