In the

# United States Court of Appeals
### For the Seventh Circuit

No. 11-3061

KATHERINE LEES,

*Plaintiff-Appellant,*

*v.*

CARTHAGE COLLEGE and
LEXINGTON INSURANCE COMPANY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-C-86—**Rudolph T. Randa**, *Judge.*

ARGUED APRIL 12, 2012—DECIDED APRIL 16, 2013

Before EASTERBROOK, *Chief Judge*, and MANION and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Katherine Lees began her freshman year at Carthage College in the fall of 2008. On September 21, 2008, she was sexually assaulted in her dorm room by two men she believed to be Carthage students. Lees withdrew from Carthage after the attack and eventually brought this negligence action against

the college and its insurer, Lexington Insurance Company (collectively, "Carthage"). Lees sought to introduce the opinion testimony of Dr. Daniel Kennedy, a premises-security expert, as evidence of the standard of care Carthage was required to meet regarding campus safety. Dr. Kennedy was prepared to testify that there were numerous security deficiencies at Carthage and at Lees's residence hall specifically, that there was a history of sexual assault at the school, and that Carthage fell short of the recommended practices in the field of campus security.

Carthage moved to exclude Dr. Kennedy's expert testimony under Rule 702 of the Federal Rules of Evidence and also moved for summary judgment, arguing that Lees had failed to present reliable expert evidence establishing the relevant standard of care. The district court excluded Dr. Kennedy's testimony, finding it inadmissable for two main reasons: First, he had relied on industry standards that were only aspirational and failed to account for variation between different academic environments; and second, the recent history of sexual assault at Carthage involved acquaintance rape, while the attack on Lees was a case of stranger rape. With Dr. Kennedy's testimony excluded, Lees lacked evidence necessary to prove her claim, so the court entered summary judgment for Carthage.

We vacate the judgment and remand for further proceedings. Although the district court did not explicitly trace and apply the framework of Rule 702, which guides the court's "gatekeeping" discretion under

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the court's decision reflects an implicit reliance on the requirements of the rule, and we find no abuse of discretion with respect to at least some of the short-comings the court identified in Dr. Kennedy's report. But some of the expert's proposed testimony is admissible under Rule 702. Specifically, Dr. Kennedy's testimony about the security standards published by the International Association of Campus Law Enforcement Administrators is not unreliable merely because the standards are aspirational; the standards represent an authoritative statement by premises-security professionals regarding recommended practices in the field of campus security, and that is sufficient to satisfy the Rule 702 requirement of reliability. Also, Dr. Kennedy's testimony about an insecure door at Lees's dorm—more specifically, the absence of a "prop alarm" on the basement door—reflects the application of reliable principles and methods to the specific facts of this case and thus satisfies Rule 702. Because Dr. Kennedy's testimony is admissible in part, Lees raised a genuine factual dispute for trial, and summary judgment for Carthage was improper.

## I. Background

Carthage College is a four-year private college located along the shores of Lake Michigan, just north of Kenosha, Wisconsin. The school has a full-time enrollment of 2,000 to 3,000 students, about 1,500 of whom live on campus. Katherine Lees is a resident of California who began her short-lived academic career at Carthage in

the fall of 2008. She is hearing impaired and primarily communicates through sign language and lip reading, but she can speak in a way understandable to those familiar with her.

Lees lived on campus in Tarble Hall, an all-female dormitory that is one of nine residence halls on campus. All residence halls are locked 24 hours a day. Between 8 a.m. and 2 a.m. on Fridays and Saturdays (and 8 a.m. and midnight on other nights) students may use their student ID to access any hall. Outside of those hours, students may access only their own residence hall. Between 9 p.m. and midnight on weekends, resident assistants ("RAs") monitor the lobby of Tarble Hall. The RAs do not staff the lobby's front table between midnight and 2 a.m., but they patrol the hall's corridors and stairways until 2:30 a.m., along with regular security staff. Tarble Hall also has a basement door that is locked from the outside and inaccessible by swiping a student ID. This door lacks a prop alarm, meaning that it can be propped open indefinitely without alerting security. The individual rooms in Tarble Hall use key-in-knob locks. Tarble Hall RAs encouraged students to follow an "open door policy" in which they would leave their doors propped open while other residents were around to encourage socializing.

In the early morning hours of September 21, 2008 (late Saturday night on the 20th to early Sunday morning the 21st), Lees was in her room with her door propped open. Shortly after midnight she saw two young men enter her doorway and say something to her. She tried

to tell them she was deaf, and the men laughed and walked away. At around 12:30 a.m., the men returned, entered the room, turned off the lights, and closed the door. One of the men then raped Lees while the other held her down. Lees was able to punch the second man in the face when he tried to assault her, which caused both men to flee. She believes the two men were Carthage students because one was wearing a "Carthage football" sweatshirt and the other a "Carthage" t-shirt. The assailants were never identified. Lees later withdrew from Carthage.

Lees brought this negligence action against Carthage College and its insurer, Lexington Insurance Company,[1] in federal court in the Eastern District of Wisconsin. The complaint invoked the court's diversity jurisdiction, and the parties agree that Wisconsin law governs the case. To establish the applicable standard of care for the jury's determination of negligence, Lees sought to introduce the expert testimony of Dr. Daniel Kennedy, a premises-security expert who has long served as a professor of criminal justice and security administration at the University of Detroit. Dr. Kennedy's report and affidavits explain his opinion that several security deficiencies existed at Carthage and Tarble Hall and that the attack on Lees was foreseeable. Specifically, Dr. Kennedy pointed to the lack of a prop alarm on the

---

[1] Lees's original complaint also named as a defendant RSUI Indemnity Company, but this insurer was later dismissed from the case.

basement door; the failure to staff the lobby between midnight and 2 a.m. on weekends; Tarble's open-door policy; the lack of a policy requiring guests to be escorted to the rooms of students they were visiting; and the lack of security cameras. Dr. Kennedy also stated that Carthage in many respects fell short of the recommended practices published by the International Association of Campus Law Enforcement Administrators ("IACLEA").

Regarding incidents of rape in particular, Dr. Kennedy noted that according to Carthage's crime-reporting statistics under the federal Clery Act, codified at 20 U.S.C. § 1092(f), there had been eight forcible sexual offenses in the five years leading up to 2008: one each in 2003, 2005, and 2006, and five in 2007. Dr. Kennedy also referenced social-science data on rape, including studies showing that women with disabilities, like Lees, were four times more likely to be raped than other women.

Carthage moved to exclude the testimony of Dr. Kennedy and also for summary judgment. The motion for summary judgment made several arguments, but the first was that Lees had failed to put forward reliable expert testimony establishing the relevant standard of care as required under Wisconsin law for this sort of negligence claim. The district court considered the two motions together and granted both, holding that Dr. Kennedy's testimony was inadmissible and that Lees therefore lacked expert evidence on the standard of care.

For a number of different reasons, the court found unreliable, and thus inadmissible, Dr. Kennedy's conclu-

sion that the attack on Lees was foreseeable. First, it held that Dr. Kennedy improperly relied on the IACLEA standards, which were merely recommended and aspirational and did not necessarily account for variation among different types of academic environments. Relatedly, the court faulted Dr. Kennedy for not analyzing security measures at colleges similarly situated to Carthage in terms of size and location. Second, the court criticized Dr. Kennedy's reliance on the recent rape statistics at Carthage, noting that the eight attacks between 2003 and 2007 were all instances of acquaintance rape, while the attack on Lees was stranger rape. The court reasoned that a school would need to take different measures to prevent acquaintance rape than to prevent stranger rape, so this recent history did not suggest foreseeability. Likewise, the court noted that the comparatively greater risk of rape for women with disabilities said nothing about the foreseeability of a student being raped by a stranger in her residence hall.

Finally, the court disregarded out-of-jurisdiction authority cited by Lees as support for her claim that sexual assault in a college dorm room is foreseeable. The court acknowledged that Carthage had a duty to provide a safe living environment but found that the plaintiffs in the cited cases had created genuine issues of fact as to breach and the duty of care. By contrast, because Dr. Kennedy's testimony was inadmissible, Lees had not produced sufficient evidence on these elements. Accordingly, the court granted Carthage's motion for summary judgment. Lees timely appealed.

## II.  Discussion

We review de novo a district court's grant of summary judgment. *Musch v. Domtar Indus.*, 587 F.3d 857, 859 (7th Cir. 2009). The summary-judgment decision here turned entirely on the district court's conclusion that Dr. Kennedy's expert testimony was inadmissible. Whether the district court applied the appropriate legal framework for evaluating expert testimony is reviewed de novo, but the court's choice of relevant factors within that framework and its ultimate conclusion as to admissibility are reviewed for abuse of discretion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 717 (7th Cir. 2000)*.*

This appeal presents two interrelated questions: first, whether Dr. Kennedy's methodology was sufficiently reliable to render his testimony admissible under Rule 702; and second, whether his testimony was sufficient on the question of the standard of care to survive summary judgment and submit the negligence claim to a jury. With respect to at least part of Dr. Kennedy's proposed testimony, we answer these questions in the affirmative.

### A.  Expert Testimony Under Rule 702

The requirements of Rule 702 of the Federal Rules of Evidence are follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert* the Supreme Court interpreted an earlier version of Rule 702[2] and explained that it imposes a special gatekeeping obligation on trial judges with regard to scientific expert testimony. The Court held that scientific evidence need not have "general acceptance," but the court must ensure that the evidence is relevant and reliable before admitting it. 509 U.S. at 588-89. The Court emphasized that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," *id.* at 594, and also explained that removing the "general acceptance" requirement from prior caselaw would not create a "free-for-all" by confusing juries with scientific testimony because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *id.* at 596. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999),

---

[2] Rule 702 originally provided as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . ."

the Court added that the *Daubert* analysis applies to *all* expert testimony under Rule 702, not just scientific testimony. The Court also noted in *Kumho* that because there are "many different kinds of experts, and many different kinds of expertise," the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors. *Id.* at 150.

Rule 702 was substantially revised in 2000 to " 'affirm[] the trial court's role as gatekeeper and provide[] some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony.' " *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 869 (7th Cir. 2001) (quoting FED. R. EVID. 702, advisory committee's note, 2000 amends.); *see also United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005) ("At this point, Rule 702 has superseded *Daubert,* but the standard of review that was established for *Daubert* challenges is still appropriate."). Essentially, the district court must make the following inquiries before admitting expert testimony: First, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case. *See* FED. R. EVID. 702; *Smith*, 215 F.3d at 717-19.

**B. Wisconsin Law of Professional Negligence**

In Wisconsin a claim of negligence has four elements: (1) the existence of a duty of care on the part of the defendant; (2) a breach of that duty of care; (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury; and (4) actual loss or damage resulting from the injury. *Hornback v. Archdiocese of Milwaukee*, 752 N.W.2d 862, 867 (Wis. 2008). On the question of duty, Wisconsin follows Judge Andrews's dissent in *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99 (N.Y. 1928), *see, e.g., Behrendt v. Gulf Underwriters Ins. Co.*, 768 N.W.2d 568 (Wis. 2009), distilled succinctly as the principle that "[e]very one owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others," *Palsgraf,* 162 N.E. at 103 (Andrews, J., dissenting). The duty of care in Wisconsin negligence law is simply stated as the duty to exercise reasonable care under the circumstances. That standard is inherently quite abstract and must be defined more specifically for any given case. *See Hoida, Inc. v. M & I Midstate Bank*, 717 N.W.2d 17, 29 (Wis. 2006) (the scope of that duty of care "depends on the circumstances under which the claimed duty arises" and "may depend on the relationship between the parties or on whether the alleged tortfeasor assumed a special role in regard to the injured party").

Where the specifics of a defendant's duty of care involve specialized knowledge, plaintiffs must introduce expert testimony to establish this element of a negligence claim. *Payne v. Milwaukee Sanitarium Found., Inc.*,

260 N.W.2d 386, 392 (Wis. 1977) ("Expert testimony should be adduced concerning those matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study or experience."). Premises-security cases like this one fall within the category of negligence claims requiring expert testimony. *See Shadday v. Omni Hotels Mgmt. Corp.*, 477 F.3d 511, 515 (7th Cir. 2007) ("It is one thing for a jury unaided by expert testimony . . . to assess the care with which the defendant in an automobile accident case drove, for that is something with which almost all jurors are familiar; it is another thing for a jury to determine the right standard of care to which to hold a hotel."); *Varner v. District of Columbia*, 891 A.2d 260, 267 (D.C. 2006) ("[E]xpert testimony is required to establish the standard of care in negligence cases . . . which involve issues of safety, security[,] and crime prevention.").

The parties agree that Lees needs expert testimony to prove her claim, but they disagree about exactly what this testimony must show. Dr. Kennedy's affidavits are mostly framed in terms of foreseeability: Given the inadequate security measures and history of sexual assault at Carthage, Lees's rape was foreseeable, so Carthage failed to exercise reasonable care under the circumstances. While the district court ultimately rejected Dr. Kennedy's testimony, it seemed to accept that foreseeability was the relevant question. The court cited *Gritzner v. Michael R.*, 611 N.W.2d 906, 912 (Wis. 2000), for the proposition that duty of care is established

"whenever it was foreseeable to the defendant that his or her act or omission to act might cause harm to some other person." Under more recent Wisconsin caselaw, however, foreseeability relates to the question of breach, not a question of the duty of care. *See Behrendt*, 768 N.W.2d at 575-76 ("'A lack of foreseeable risk in a specific case may be a basis for a no-breach determination, but such a ruling is not a no-duty determination. Rather it is a determination that no reasonable person could find that the defendant has breached the duty of reasonable care.'" (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARMS § 7(a) cmt. j (Proposed Final Draft No. 1, 2005))).

Accordingly, foreseeability is not the relevant focus of inquiry for determining the admissibility of expert testimony in a case like this one. Rather, expert testimony is required to establish the standard of care for ensuring the security of a campus residential environment. Colleges must provide students with a safe living environment as part of their generalized duty of care, but what are the contours of that duty in a given case? More specifically, what security measures must a particular college undertake to provide a level of safety that is reasonable under the circumstances? That question—what specific actions did Carthage need to take to meet its generalized duty of care—is what the term "standard of care" addresses in this context, and that is the question the expert's testimony must address. In a sense, in this context the standard of care is a fusion of the elements of duty and breach: The security measures that were reasonable under the circumstances make up

the duty of care, and to the extent that Carthage's actions fell below this standard, it breached that duty. The foreseeability of particular kinds of harms may inform this analysis, but foreseeability itself is not the ultimate issue for the jury as it may be in ordinary negligence cases.

To see how this concept operates in practice, consider how professional negligence is addressed in the more familiar realm of medical malpractice. The Wisconsin Supreme Court has approved the following language for instructing juries on medical negligence, which closely tracks Wisconsin Civil Jury Instruction No. 1023:

> In treating [patient], [doctor] was required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances by the average specialist who practices the specialty which [doctor] practices, having due regard for the state of medical science at the time [patient] was treated. The burden in this case is on the plaintiffs to prove that [doctor] failed to conform to this standard.

> A physician does not guarantee the results of his care and treatment. A physician must use reasonable care and is not liable for failing to use the highest degree of care, skill, and judgment. [Doctor] cannot be found negligent simply because there was a bad result. Medicine is not an exact science. Therefore, the issue you must decide in determining whether [doctor] was negligent is not whether there was a bad result but whether he failed to use the degree of care, skill, and judgment which is exercised by

the average physician practicing the [doctor's subspecialty].

If you find that more than one method of treatment for [patient]'s injuries is recognized, then [doctor] was at liberty to select any of the recognized methods. [Doctor] was not negligent merely because he made a choice of a recognized alternative method of treatment if he used the required care, skill, and judgment in administering the method. This is true even though other medical witnesses may not agree with him on the choice that was made.

*Nowatske v. Osterloh*, 543 N.W.2d 265, 269 (Wis. 1996), *abrogated on other grounds by Nommensen v. Am. Cont'l Ins. Co.*, 629 N.W.2d 301, 313 n.6 (Wis. 2001). Extrapolating to the premises-security claim in this case, the pivotal question is whether Carthage used the degree of care and judgment usually exercised by the average college under similar circumstances, having due regard for the contemporary state of campus-security practices. Where multiple approaches to premises security are recognized as adequate, colleges are free to choose among them. A college breaches its duty of care when it fails to conform to this standard.

## C. Application to Dr. Kennedy's Testimony

With this background in place, we now move to the key question on appeal: whether the district court properly excluded Dr. Kennedy's testimony. Before proceeding, we note that although the court's written

decision does not precisely track the requirements of Rule 702, the court rejected Dr. Kennedy's testimony on reliability grounds, reflecting an implicit application of the analysis required under the rule. Regarding the threshold inquiry of Rule 702—whether the proposed expert is qualified—the parties agree that the district court implicitly held that Dr. Kennedy is qualified to give expert testimony on premises security. He has several degrees in sociology and educational sociology, has published extensively in the field of criminology and security administration, has trained specifically in physical premises security, and has testified as an expert witness in many similar cases. Carthage does not challenge Dr. Kennedy's qualifications.

The main point of contention is whether Dr. Kennedy followed a reliable methodology in reaching his conclusions and reliably applied it to the specific facts of this case. To summarize his process, Dr. Kennedy reviewed witness statements, including the testimony of Carthage's former director of security; visited and inspected the security conditions at Tarble Hall; reviewed the various security protocols at Tarble and Carthage generally; reviewed published statistics and police reports involving sexual assault on campus; compared Carthage's practices with those recommended in the IACLEA guidelines; and surveyed the professional literature on sexual assault and campus-security practices.[3]

---

[3] The parties dispute whether Dr. Kennedy's approach should qualify as a "forensic methodology" or merely a "totality
(continued...)

Drawing from this investigation and his experience and expertise, Dr. Kennedy identified the standard of care for college premises security and concluded that Carthage's practices fell short of that standard in numerous respects. Specifically, he opined that Carthage should have installed a prop alarm on the basement door at Tarble Hall; that the lobby should have been staffed between midnight and 2 a.m.; that visitors should have been escorted to dorm rooms; that the building should have used security cameras; and that students should have been told to close their doors when they were not socializing, especially late on weekend nights.

As a general matter, this methodology fits the factual and legal context of this case. To be sure, Dr. Kennedy's approach "may not have been 'scientific,' but it was both 'technical' and 'specialized'" within the meaning of Rule 702, which "does not condition admissibility on the state of the published literature, or a complete and flaw-free set of data." *United States v. Mikos*, 539 F.3d 706, 711 (7th Cir. 2008); *see also United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013) ("expert evidence is not limited to 'scientific' evidence . . . [but] includes any evidence created or validated by expert methods and presented by an expert witness that is shown to be reli-

---

[3] (...continued)
of the circumstances" approach. The label is not important. What matters is whether he consulted reliable sources and provided reasoned explanations connecting the source material to his conclusions.

able"). Dr. Kennedy was offering nonscientific expert testimony in a particular field—premises security, or more specifically, campus security—that does not easily admit of rigorous testing and replication. "[E]xpert testimony that is more technical than scientific is governed by the same criteria as the admission of scientific expert testimony." *Dhillon,* 269 F.3d at 869.

The district court had two major criticisms of Dr. Kennedy's methodology: (1) he relied on industry guidelines that are only aspirational; and (2) he failed to distinguish acquaintance rape from stranger rape in Carthage's recent history. With regard to the IACLEA standards, there is no question that these guidelines, standing alone, do not establish the standard of care. As the district court noted, they are only aspirational practices, not a formal industry standard; even formal industry standards are not dispositive as to negligence liability. *Michaels v. Mr. Heater, Inc.*, 411 F. Supp. 2d 992, 997 (W.D. Wis. 2006). But the relevant question for admissibility purposes is not whether the IACLEA guidelines are controlling in the sense of an industry code, or even how persuasive they are. It is only whether consulting them is a methodologically sound practice on which to base an expert opinion in the context of this case. For a claim of this nature, we are convinced that it is. The IACLEA guidelines are an authoritative set of recommended practices specific to the field of campus security and are regularly consulted by campus-security professionals. The extent of Carthage's deviations from these practices may surely inform an expert opinion as to whether Carthage met its standard of care. Carthage may argue, of course, that the IACLEA guide-

lines are only advisory, or outdated, or overly general, and for those reasons should not be taken as persuasive on the standard of care. But that argument goes to the weight of the expert's testimony, not its admissibility. The district court abused its discretion in excluding this part of Dr. Kennedy's testimony.

Carthage cites *Varner v. District of Columbia*, 891 A.2d 260 (D.C. 2006), as support for its assertion that courts have "specifically rejected the use of the IACLEA recommendation as 'standards' for residence hall security." But *Varner* considered this question only as a matter of sufficiency of the evidence at summary judgment, not as it concerned the admissibility of expert testimony. The plaintiffs in *Varner* introduced expert testimony that a university violated a national standard of care by failing to conform its keycard-access protocols to the IACLEA recommendations. The court nevertheless upheld the grant of summary judgment to the defendants, holding that "[a]spirational practices do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence." *Id.* at 272. But *Varner* did not hold that the testimony of the expert in question was inadmissible because of his reliance on the IACLEA standards. Indeed, the *admissibility* of various pieces of expert testimony was not at issue in *Varner*—only whether the *content* of that testimony sufficed to overcome summary judgment under local negligence standards. Importantly, deviation from the IACLEA recommendations appeared to be the *only* basis in *Varner* for the expert's conclusion that the university violated the standard of care. *See id.* at 271-72. That differs from the present case, in which the IACLEA stan-

dards were only one factor informing Dr. Kennedy's opinion.

Both Carthage and the district court also fault Dr. Kennedy for not relying on "community standards"—that is, he did not specifically compare security practices at Carthage to schools similarly situated in terms of location and size. But while references to community standards could be part of a reliable methodology, such an analysis is not *necessary* for expert testimony to be admissible. Strict reliance on this factor to exclude the expert testimony would be out of step with the sort of "flexible" inquiry called for under Rule 702. *Daubert*, 509 U.S. at 594. And a dispositive focus on community standards is especially inappropriate given that Wisconsin does not follow the locality rule for professional negligence. *See Shier v. Freedman*, 206 N.W.2d 166, 173-74 (Wis. 1973) (rejecting the locality rule in the context of medical malpractice). Local custom or practice may be *evidence* of the applicable standard of care, but they do not *establish* the standard of care any more than national industry guidelines. Again, Carthage is free to argue that community standards would have been a preferable benchmark, but that again is a matter of evidentiary weight, not admissibility. Certainly it is the sort of issue that can be explored adequately via the normal adversarial process of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011) ("[t]he admissibility determination [under Rule 702] is not intended to supplant the adversarial process").

The district court did not abuse its discretion, however, in criticizing Dr. Kennedy's failure to distinguish between acquaintance rape and stranger rape when evaluating prior instances of sexual assault at Carthage. As part of his analysis, Dr. Kennedy reviewed Carthage's published crime statistics, which noted eight instances of sexual assault on campus between 2003 and 2007, five of which occurred in 2007 alone. This history of sexual assault informed Dr. Kennedy's opinion as to what specific security measures would have been reasonable under the circumstances. As the district court observed, however, these eight crimes were all instances of acquaintance rape, while the assault on Lees was stranger rape. Relying on these crime statistics without accounting for this distinction does not reflect the application of reliable principles and data to the facts of this case. The district court properly excluded this aspect of the proposed expert testimony.

On the other hand, Dr. Kennedy's testimony about the insecure basement door—specifically, the absence of a prop alarm—is directly relevant to the facts of this case. The district court did not separately address this aspect of his testimony, which is sufficiently reliable—prop alarms are recommended under the IACLEA standards—and was reliably linked to the facts of this case. This part of Dr. Kennedy's testimony should not have been excluded. As to the remaining points underlying his opinion—the lack of a front-desk monitor between midnight and 2 a.m., the open-door "socializing" policy, the apparently lax hall monitoring, and the absence of security cameras—his report lacks sufficient analysis tied to experiential data about the use of these

practices in college residence halls. Perhaps that analysis is theoretically possible, but on the present record we find no abuse of discretion regarding these aspects of the proposed expert testimony.

For completeness, we note that the Rule 702 requirement that Dr. Kennedy's testimony will assist the jury effectively merges with the question whether his testimony sufficiently speaks to the standard of care. Carthage insists that Dr. Kennedy's testimony—even if reliable under Rule 702 and *Daubert*—addresses only foreseeability, which does not establish the standard of care under Wisconsin negligence law. For the reasons already explained, we agree that foreseeability is not the proper focus in this case—although the confusion is perhaps understandable in light of the mixed messages in the Wisconsin caselaw on this question. *Compare Behrendt*, 768 N.W.2d at 575 ("'A lack of foreseeable risk in a specific case may be a basis for a no-breach determination, but such a ruling is not a no-duty determination.'" (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARMS § 7(a) cmt. j (Proposed Final Draft No. 1, 2005))), *with Gritzner*, 611 N.W.2d at 912 (Wis. 2000) ("The first element, a duty of care, is established under Wisconsin law whenever it was foreseeable to the defendant that his or her act or omission to act might cause harm to some other person.").

But even though Dr. Kennedy's affidavits reflect this legal imprecision, the deficiency is hardly fatal for Lees. The task of instructing the jury on the applicable law belongs to the judge, not the expert witness. The admissibility of Dr. Kennedy's testimony turns on whether its

*substance* speaks to the standard of care that Carthage was required to meet. Evaluated from this perspective, at least some aspects of Dr. Kennedy's proposed testimony are admissible; based on his expertise, investigation, and informed analysis, he is prepared to testify as to particular security measures he believes were required under the circumstances and that Carthage failed to provide. To repeat, Dr. Kennedy's general testimony about the IACLEA security standards is admissible, as is his more specific testimony faulting the lack of a prop alarm on the basement door of Tarble Hall. On these points, the clear import of Dr. Kennedy's report and affidavits is that Carthage deviated from the required standard of care. That is exactly the sort of expert testimony that one would expect on the subject of premises security; indeed, his testimony provides the necessary factual support for an element of the claim. To this extent at least, Dr. Kennedy's testimony is admissible under Rule 702, and with that testimony Lees has the expert support for her claim required by Wisconsin professional-negligence law.

Accordingly, the summary judgment in favor of Carthage College is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.